# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| DON D. MULL | ‖ | |
| Plaintiff, | ‖ | No. C05-0142 |
| vs. | ‖ | **ORDER** |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ‖ | |
| Defendant. | ‖ | |

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On September 1, 2005, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 7). The final decision of the Commissioner of Social Security is reversed this matter is remanded for further proceedings.

## I. PROCEDURAL BACKGROUND

Plaintiff Don Mull applied for Supplemental Security Income benefits on January 25, 2002, alleging an inability to work since January 25, 2002 (Tr. 82-85). Mr. Mull's application was originally denied (Tr. 63-66), and denied again on reconsideration (Tr. 68-71). A hearing before Administrative Law Judge (ALJ) David Flierl was held on October 7, 2004 (Tr. 26-48). The ALJ denied Mr. Mull's appeal in a decision dated December 23, 2004 (Tr. 11-20). The Appeals Council denied Mr. Mull's request for review on June 19, 2005 (Tr. 5-7). This action for judicial review was filed on August 22, 2005 (docket number 5).

## II.  FACTUAL BACKGROUND

### A.  Medical History

On June 29, 1998, Mr. Mull was admitted to the psychiatry service at the University of Iowa Hospitals and Clinics (UIHC) with a diagnosis of drug intoxication and crystal methamphetamine abuse (Tr. 172-177).  He also was suffering from an infection in his right knee which was treated during this stay (Tr. 172-177).  He was discharged on June 30, 1998 (Tr. 172-177).

On August 18, 1998 Mr. Mull presented to the psychiatry clinic at the UIHC demanded to be admitted or else he was going to "kill people" (Tr. 159).  According to the hospital records, Mr. Mull's suicidal and homicidal ideations were gone immediately after being admitted and did not recur during his stay (Tr. 159).  Mr. Mull's probation officer was contacted and the hospital was informed that there was a warrant for Mr. Mull's arrest as he was in violation of his probation (Tr. 159).  He was discharged to jail on August 19, 1998 (Tr. 159).  According to the notes of the psychiatric staff evaluation conference, it was difficult to get details from Mr. Mull about why he wanted to be hospitalized, but the major motivation seemed to have been his desire to avoid the legal consequences of his probation violation (Tr. 161-62).

On December 21, 1999, Dr. Scott Jennisch conducted a psychiatric evaluation of Mr. Mull while he was an inmate at the Anamosa State Penitentiary (Tr. 151-52).  Dr. Jennisch's report of this evaluation states "It becomes more clear tonight that the primary  motivator appears to involve his ability to maintain disability upon release as he notes that he has been considered disabled in the past" (Tr. 151).  It goes on to state that Mr. Mull "is very clear in requesting that my psychiatric diagnosis for him require medications and qualify him for disability, yet not be so severe to interfere with his potential for a release from this institution" (Tr. 151).  Dr. Jennisch found that Mr. Mull had no specific active psychiatric symptoms (Tr. 151).  Dr. Jennisch's report states "I do not believe that [Mr. Mull] has a primary psychotic disorder or evidence of schizoaffective

disorder at this time" (Tr. 151). Dr. Jennisch saw no indication for psychiatric medication (Tr. 152).

On August 1, 2000, Mr. Mull underwent a psychiatric evaluation as an inmate at the Anamosa State Penitentiary by Dr. Bert Hartman (Tr. 148). Dr. Hartman's records from this evaluation state that Mr. Mull "continues to have an agenda in which he insists he has a psychiatric illness and needs psychiatric medication" (Tr. 148). Dr. Hartman's records further state that Mr. Mull "insists that he will have a diagnosis of a psychiatric illness when he is released from prison and will receive a 'fat check.' He has been considered disabled in the past and wants to continue this" (Tr. 148). When Dr. Hartman questioned Mr. Mull about specific psychiatric symptoms, Mr. Mull became very irritable and used profanity (Tr. 148). Dr. Hartman opined that it was likely that Mr. Mull's past polysubstance abuse and dependence clouded previous psychiatric evaluations (Tr. 148). Dr. Hartman characterized Mr. Mull's thought process at this time as "goal directed toward achieving psychiatric diagnosis and receiving 'any medication'" (Tr. 148). In Dr. Hartman's opinion, Mr. Mull "does not give any clear symptomology that warrants medications" (Tr. 149).

On October 9, 2001 Mr. Mull had another psychiatric evaluation conducted while an inmate at the Anamosa State Penitentiary (Tr. 142). Dr. Hartman's report of this evaluation states that Mr. Mull has been off all psychiatric medications for over two years and "has a long history of substance abuse and maladaptive personality style but there is no clear mental illness that would require medications" (Tr. 142). During this evaluation Mr. Mull denied having any significant or active psychiatric problems or psychotic symptoms (Tr. 142).

From April 2002 through August 2004, Mr. Mull was treated at the Abbe Center for Community Mental Health (Tr. 228-286). During this time he was seen by a social worker on 10 occasions and treated by psychiatrist Dr. Collyer Ekholm 27 times (Tr. 228-286). Mr. Mull's intake assessment and social history, as reported by Dr. Ekholm, states "[p]atient says now for quite some time he has felt that the Hepatitis C is the reason he has

no stamina and no energy" (Tr. 255). During this interview Mr. Mull reported that he occasionally hears voices, but they are not telling him to do anything, and he specifically denied any paranoid delusions (Tr. 255). Mr. Mull's primary diagnoses was psychosis NOS (Tr. 255).

Mr. Mull's intake assessment and social history, taken by his social worked on May 3, 2002, reveals that Mr. Mull reported having a social phobia, i.e., he does not trust anyone, does not like to be around people, feels that people are out to get him, and gets paranoid when in a crowd (Tr. 244). Mr. Mull also reported having ongoing symptoms of schizophrenia and explosive temper disorder, which he was diagnosed with at age 16 (Tr. 244-45). Mr. Mull also reported suicidal ideation, but that he does not feel like he is suicidal, and that he is depressed due to isolation, which is exacerbated by having no income (Tr. 245). As for leisure activities, Mr. Mull reported that he enjoys watching television and going to the library, which he does approximately once a week (Tr. 245). He also reads the newspaper and spends time with his friend (Tr. 245). His primary diagnosis was psychosis, NOS (Tr. 246, 255). His current GAF was 45 (Tr. 246, 255). His highest GAF in the past year was 50 (Tr. 246, 255). When he saw Dr. Ekholm again on May 7, 2002, Mr. Mull reported that he was doing okay on the medications Dr. Ekholm gave him, said he was sleeping adequately and denied any problems (Tr. 243). Mr. Mull denied anything suggestive of mania or psychosis since his last visit (Tr. 243).

Mr. Mull saw his social worker again on May 17, 2002 and on June 3, 2002, at which visit he reported that he is feeling depressed and believes he is feeling this way because he has not heard from SSA yet and it has been almost 120 days (Tr. 241, 240). Mr. Mull saw Dr. Ekholm on June 4, 2002, at which visit he also reported that he is worried about his social security application (Tr. 239).

On June 24, 2002, Mr. Mull had an appointment with his social worker (Tr. 238). According to the records of this visit, Mr. Mull was upset that he had received a denial letter from SSA (Tr. 238). Mr. Mull reported an increase of depression and suicidal ideation (Tr. 238). When Mr. Mull saw Dr. Ekholm on July 2, 2002, he reported that the

voices are better, he denied any new or increased side effects from his medication, but reported that he still has intense difficulty tolerating any type of crowds (Tr. 237). Mr. Mull saw his social worker on July 16, 2002 (Tr. 236).

On August 9, 2002, Mr. Mull saw Dr. Ekholm (Tr. 234). During this visit he reported having more "bad thoughts" about harming himself, although he had no intent or plan to actually harm himself (Tr. 234). Mr. Mull reported that his paranoia was pretty good for him, and he denied further auditory hallucinations (Tr. 234). Dr. Ekholm opined that Mr. Mull's mental status seemed about the same (Tr. 234). Mr. Mull met with his social worker again on August 20, 2002, at which time they filled out SSI paperwork (Tr. 232). Mr. Mull reported that he is increasingly frustrated, but that Dr. Ekholm's increased medication of him has helped decrease his auditory hallucinations and increased his ability to function a little (Tr. 232).

On September 5, 2002, Mr. Mull had an appointment with his social worker, at which time he reported that he had been feeling depressed due to his lack of income or anything to do (Tr. 231). When his social worker encouraged Mr. Mull to look into work, Mr. Mull said that he did not want to hurt his chances with SSI (Tr. 231). Mr. Mull met with Dr. Ekholm on September 6, 2002 (Tr. 230). Mr. Mull reported that the increase in his Zyprexa made his nightmares and the inability to disregard the voices go away (Tr. 230). He reported that he was no longer hearing random voices telling him to kill people, but that he still has the usual dialogue of auditory hallucinations, which he is able to withstand (Tr. 230). He reported that he was sleeping well at night, but that he wanted to sleep more than normal due to his poor mood (Tr. 230).

Mr. Mull saw his social worker again on September 30, 2002 (Tr. 229). Mr. Mull saw Dr. Ekholm on October 4, 2002 (Tr. 279). During his visit with Dr. Ekholm Mr. Mull reported that he is spending more time awakening in the middle of the night and unable to get back to sleep (Tr. 279). He reported that his chronic suicidal ideation was unchanged (Tr. 279). Dr. Ekholm's assessment remained unchanged (Tr. 279). Mr. Mull had an appointment with his social worker on October 21, 2002 (Tr. 228).

On November 4, 2002, Mr. Mull saw Dr. Ekholm (Tr. 278). He reported that he had been compliant with his medication, but that he is having trouble with auditory hallucinations again - telling him to kill himself or someone else (Tr. 278). Dr. Ekholm's notes state that Mr. Mull "seems actually better than what I have seen him before" (Tr. 278). At his December 2, 2002 appointment, Mr. Mull reported that the frequency of the auditory hallucinations continues to decrease and that he is better able to withstand them (Tr. 277). Dr. Ekholm opined that Mr. Mull looked "the best [she's] ever seen him (Tr. 277). At his January 7, 2003 appointment with Dr. Ekholm, Mr. Mull reported that he was having no more paranoid thoughts and denied any suicidal or homicidal ideation, intent or plan (Tr. 276).

At his February 19, 2003 appointment with Dr. Ekholm, Mr. Mull reported feeling worse and having increased auditory hallucinations (Tr. 275). Mr. Mull admitted that he had been noncompliant with his medication (Tr. 275). Mr. Mull reported a slight increase in his symptoms of psychosis when he saw Dr. Ekholm on March 19, 2003 (Tr. 274). Notes from this visit state that Mr. Mull "[s]ays very pleasantly in a matter-of-fact tone that he is always worried because the voices tell him he should kill himself or kill others, that he might accidently yield" (Tr. 274). Dr. Ekholm's assessment continued as psychosis, not otherwise specified (Tr. 274). At his April 30, 2003 appointment with Dr. Ekholm Mr. Mull reported that "this is about the best he has ever done" (Tr. 273).

On May 27, 2003, Mr. Mull had an annual update and assessment conducted by his social worker (Tr. 257-61). The social worker's report states, in pertinent part:

> Don currently feels that he is unable to work due to a poor work history and physical and mental illnesses. Don reports that his auditory hallucinations are very disruptive and he is unable to concentrate or remember anything.
>
> Don is struggling with not having any income and feeling stressed out by the appeal procedures for SSI. Don has been put on a waiting list by his lawyer and he has had to wait a very long time before he can take his case to court. The

> above situations cause Don's depression to increase.
>
> It is also difficult for Don to be a part of social activity and groups due to his paranoia and auditory hallucinations. He continues to struggle with the hurt from being abandoned by his family and having a very small support network.

(Tr. 259). His current diagnosis remained psychosis, NOS (Tr. 260). The assessment also states that "[m]uch of [Mr. Mull's] depression stems from his financial issues and [Mr. Mull] is eagerly awaiting his trial for SSI" (Tr. 261).

Mr. Mull saw Dr. Ekholm again on May 29, 2003 (Tr. 272), and on July 3, 2003 (Tr. 271). At his July 3, 2003 visit, Mr. Mull reported that he no longer has hallucinations that he hears outside his head, and that his depressive symptoms are pretty good (Tr. 271). Dr. Ekholm's notes from Mr. Mull's July 31, 2003 visit state that Mr. Mull "[s]ays his depression is worse, but what he actually appears to mean is that he is unhappy and frustrated that his lawyer has said it will be several years before he will be able to get his disability into court" (Tr. 270).

On August 28, 2003, Mr. Mull reported to Dr. Ekholm that he sleeps about 12 hours a day, which he referred to as his "hobby" (Tr. 269). Dr. Ekholm opined that Mr. Mull was pleasant and seemed "genuinely pleased that he is feeling somewhat better than he has for many years" (Tr. 269). Mr. Mull saw Dr. Ekholm again on September 25, 2003 (Tr. 268) and on November 4, 2003 (Tr. 167). At his November appointment, Mr. Mull reported that he is angry and frustrated that his disability appeal has taken over a year and that it still has not started (Tr. 267). He complained of more frustration and more thoughts about self-harm above his usual chronic level (Tr. 267). Dr. Ekholm changed her assessment of Mr. Mull from psychosis, NOS to schizoaffective disorder (Tr. 267).

On December 2, 2003, Mr. Mull saw Dr. Ekholm and reported that he was doing better than he had done in quite some time (Tr. 266). Mr. Mull also saw Dr. Ekholm on

January 13, 2004 (Tr. 265), on February 11, 2004 (Tr. 264), on March 10, 2004 (Tr. 263), and on April 5, 2004 (Tr. 262). At his April appointment, Mr. Mull reported increased hallucinations and more difficulty with the intensity of his chronic suicidal ideation since his last visit (Tr. 262). His dosage of Zyprexa had been decreased the month prior (Tr. 262). His Zyprexa dosage was increased (Tr. 262).

Mr. Mull next saw Dr. Ekholm on June 21, 2004 (Tr. 286), and then again on August 2, 2004 (Tr. 285). At his August 23, 2004 appointment, Mr. Mull reported that he had stopped taking his medications for a while (Tr. 284). He was upset because his significant other was in the hospital and frustrated because her son is disrespectful of almost all adults in the house, including him (Tr. 284).

### B. Plaintiff's Subjective Complaints

Adaline Diamond completed a third party daily activities questionnaire on March 18, 2002, on behalf of Mr. Mull (Tr. 102-107). Ms. Mull sees Mr. Diamond three to four times a week and has known him for over 15 years (Tr. 102). According to Ms. Diamond, Mr. Mull bathes and shaves with help or reminders and dresses and does hair care regularly (Tr. 102). Ms. Diamond further noted that Mr. Mull is tired and sleeps (Tr. 102). Mr. Mull does laundry and yard work with help or reminders, and rarely does dishes, changes sheets, irons, or vacuums/sweeps (Tr. 102). Ms. Diamond further stated that Mr. Mull "becomes too tired to complete most chores," that he rarely prepares meals at home, making mostly cold sandwiches, and rarely does any shopping (Tr. 103). Ms. Diamond's questionnaire provides that Mr. Mull is able to independently take his medications as prescribed, and that Mr. Mull has no recreational activities or hobbies (Tr. 103-104). Mr. Mull watches television and reads the newspaper, but has little understanding of either (Tr. 104). He visits with friends two to three times per week, but sometimes has difficulty going out in public (Tr. 104). Mr. Mull participates in no social groups or activities and rarely has contact with others as he likes to be alone (Tr. 104). According to Ms. Diamond, Mr. Mull responds poorly to criticism and change, and sometimes has problems concentrating or remembering (Tr. 104-105). Mr. Mull also has

trouble sometimes completing a task or following directions (Tr. 105). He is able to pay bills and manage money, but is too tired to complete a workday (Tr. 105).

On March 19, 2002, Mr. Mull completed a daily activities questionnaire (Tr. 108-111). At the time he was living in a shelter with three other men (Tr. 108). He stated that he bathed and shaved with help or reminders and dressed and did hair care on a regular basis (Tr. 108). Regarding his sleeping habits, Mr. Mull stated that he sleeps a lot, is always tired, but wakes up off and on (Tr. 108). He rarely does laundry, dishes, washes the car or does yard work (Tr. 108). He regularly takes out the trash (Tr. 108). He changes his sheets with help or reminders (Tr. 108). Mr. Mull stated that he makes sandwiches for himself and has chips, milk and sometimes coffee (Tr. 109). When he runs out of stuff he walks to the store and gets more (Tr. 109). His other errands include doctor appointments and visits to social services (Tr. 109). He does not drive because his driver's license has been suspended (Tr. 109). He uses public transportation or walks to get around (Tr. 109). Mr. Mull stated that he sometimes forgets to take his medications, but he tries to remind himself (Tr. 109). He engages in no recreational activities or hobbies, and watches television and reads newspapers, but usually does not remember or understand what he watches/reads (Tr. 110). Mr. Mull stated that he has two people that he visits, one twice a month and the other two to three times per week (Tr. 110). Mr. Mull claims that he sometimes has difficulty going out in public because he feels like people are always talking about him or mean him ill will (Tr. 110). He sometimes has problems getting along with others (Tr. 110). He got along adequately with former employers, supervisors and coworkers (Tr. 110). Mr. Mull stated that he gets upset and bewildered by stress and is able to pay bills and manage his money (Tr. 111). Mr. Mull stated that "with the hepatitis C, I am always drained of energy and tired" (Tr. 111).

Mr. Mull also completed a personal pain/fatigue questionnaire on March 19, 2002 wherein he stated that his whole body feels week most of the time and that he gets sporadic sharp pains on the right side of his abdomen around his liver area (Tr. 114). He further stated that his pain and fatigue are worsened when he has to be on his feet for a long time

or walk long distances (Tr. 114). He stated that he is fatigued every day, especially in the late morning and afternoon (Tr. 114). His pain sometimes wakes him up at night (Tr. 114). He takes no pain mediation (Tr. 115). He cannot do very much strenuous activity and cannot participate in sports, do heavy lifting, or much exercise (Tr. 115). Due to his pain and fatigue, Mr. Mull stated that he needs to sleep more than eight hours a day and needs to take naps (Tr. 116). He cannot life heavy things (Tr. 116). Mr. Mull stated that he can maybe walk one mile before getting "real wore out, weak" and that he cannot stand for very long, and has to move every 15-20 minutes in sitting situations (Tr. 117). Regarding his daily routine, Mr. Mull stated that he gets dressed, makes his bed, goes to the bathroom, goes to the library and reads the newspaper, sometimes watches a video, sometimes visits his friend, and watches television (Tr. 117).

On August 15, 2002, Mr. Mull completed another daily activities questionnaire (Tr. 123-126). Regarding his sleeping habits, Mr. Mull stated "I sleep a lot" (Tr. 123) Mr. Mull further stated that he has a lot of difficulty going out in public because he gets paranoid being around a lot of people (Tr. 125). He further stated that he "think [sic] people are out to do me harm" (Tr. 125). He stated that he got along very poorly with former employers, supervisors and coworkers, explaining that he does not like to be told what to do, that he has a problem understanding, and that he gets frustrated and cannot handle stress (Tr. 125). Mr. Mull claimed that he has a lot of problems concentrating or remembering and that changes bother him a lot (Tr. 126). He reacts to stress by getting depressed, anxious, and sleeping it away (Tr. 126). Finally, Mr. Mull stated "I believe that since I was already [sic] decided upon when I was already on SSI that it was permanent I would not get better just because I was in prison I feel my previous condition is still [sic] same" (Tr. 126).

Ms. Diamond completed another daily activities questionnaire on August 19, 2002 (Tr. 127-130). Ms. Diamond's responses were largely consistent with her prior questionnaire, although she elaborated some of her responses (Tr. 127-130). Ms. Diamond stated that Mr. Mull's problems with his self-care started after his release

from prison and occur because he is depressed and sleeps a lot (Tr. 127). According to Ms. Diamond, Mr. Mull "sleeps depression and agitation away" (Tr. 127). Ms. Diamond further stated "Don has seizures, so he stays away from most chores. His mental condition is as such he isn't about to do the normal things in life." (Tr. 128). Ms. Diamond responded in this questionnaire that Mr. Mull needs to be reminded to keep his doctor appointments and to take his medication (Tr. 128). Ms. Diamond characterized Mr. Mull as "shy, incompatible, very distant" (Tr. 129). Ms. Diamond stated that Mr. Mull got along "adequately" with former employers, supervisors, and coworkers, and was "very well liked" (Tr. 129).

On August 20, 2002, Mr. Mull completed a third daily activities questionnaire (Tr. 131-134). In this questionnaire he stated that he forgets to do self-care and sleeps about 12 hours per day due to his depression (Tr. 131). He stated that he sometimes wakes up in the middle of the night due to auditory hallucinations (Tr. 131). He has problems completing chores because he has difficulty concentrating and becomes frustrated easily (Tr. 131). Mr. Mull stated that he grocery shops by himself about four times per month (Tr. 132). His errands include medical and psychiatric appointments, which he needs to be reminded of (Tr. 132). He sometimes forgets to take his medications (Tr. 132). He goes to the library once a week and goes for walks once or twice a week (Tr. 133). He stated that he has a lot of difficulty going out in public because he is paranoid that people want to "do him bad" (Tr. 133). He states that he has auditory hallucinations when he is around people (Tr. 133).

## C. Hearing Testimony

Mr. Mull testified that he was born on January 29, 1955, went through the tenth grade in high school, and received his GED in Job Corp (Tr. 29). He previously worked as a security guard for Night Hawk Detective Agency, which employment lasted about one year (Tr. 29-30). Mr. Mull testified that he is very paranoid, cannot handle life, has suicidal thoughts, and hears voices inside his head (Tr. 30). He claims that the voices tell him to do bad things (Tr. 30). The voices tell him to go out and kill, and stuff like that,

but he knows that it is not normal to think that you should kill others or yourself (Tr. 31). He takes medication so he does not hear the voices as bad as he used to (Tr. 30). Mr. Mull testified that he is depressed all of the time, even though he takes medication for it, and that he cannot stand to be around very many people (Tr. 32). He goes out in public as little as possible, spending most of his time in the house either watching television or sleeping (Tr. 32). Mr. Mull testified that he does not sleep well at night as he wakes up from bad dreams (Tr. 33). He only has two friend, one of which is his girlfriend (Tr. 33). Mr. Mull used to visit the library frequently, but testified that he had not been going there for quite a whole now because it bothered him to be around people who were moving around (Tr. 35).

Regarding his daily activities, Mr. Mull testified that he really just exists, going day by day. He has no certain time that he wakes up, does little cleaning, does no dishes or cooking, but does do laundry (Tr. 38). Mr. Mull has not tried to work in a job since being released from prison (Tr. 38). When questioned about his reports to his social worker that he did not want to work because he did not want to hurt his chance to get benefits from SSI, Mr. Mull testified that he knows that you cannot work and receive SSI and that he cannot work, he cannot cope with it (Tr. 39). He testified that he gets flustered by the work environment, and then would snap on people and get fired (Tr. 41). While in prison he had a job at the laundry folding jeans for about an hour a day (Tr. 41).

Mr. Mull testified that his Hepatitis C causes pain in his side and makes him feel drained and tired (Tr. 38). He testified that he sometimes cannot sleep at night, that it just comes and goes when he sleeps, and that a lot of times he just lays in bed but is not sleepy (Tr. 38).

The ALJ posed the following hypothetical question to the vocational expert: "Given a person who would be 47-years of age and requiring a GED education with no past relevant work, no exertional limitations. Suppose the person was limited to simple and repetitive work, limited contact with the public." (Tr. 46). Assuming these limitations, the vocational expert testified that Mr. Mull could perform the work of a

housekeeping/cleaner working at a hotel or motel cleaning guest rooms or of a folder in a laundry (Tr. 46-47). The ALJ then modified the hypothetical to include "no exertional limitation, restrictions of activities of daily living were extreme, (INAUDIBLE) social functioning were extreme, maintaining concentration, persistence or pace was marked, with repeat episodes of decompensation in work like settings is being marked" (Tr. 47). The vocational expert testified that there would not be any jobs in the national economy Mr. Mull could perform given these restrictions (Tr. 47).

### D.  Competing RFCs

On May 7, 2002, licensed psychologist Jacque Fielder conducted a psychological review on referral from the Disability Determination Services Bureau (Tr. 196-201). After reviewing Mr. Mull's medical records, performing various tests on Mr. Mull, and interviewing him, Mr. Fielder concluded that "[a]lthough [Mr. Mull] is alleging diagnosis of schizophrenia and reports that he hears voices, his self-report is somewhat equivocal and there was no overt indication of an individual who is in an acute state of mental illness." (Tr. 200). Mr. Fielder further opined that "Mr. Mull's history of drug and alcohol dependence has contributed to his inability to obtain and maintain sustained competitive employment." (Tr. 201). Regarding Mr. Mull's ability to work, Mr. Fielder stated:

> At this time, it is this examiner's professional opinion that Don Mull could remember and understand up to moderately complex instructions, procedures, and locations if he chose to do so. He appears to have the mental status capacity to carry out at least moderately complex instructions, and to maintain a reasonable degree of attention, concentration, and pace in an appropriate work environment, again if he chose to do so. History would suggest that he may have had some difficulties interacting appropriately with supervisors, co-workers and the public, and these difficulties might continue as suggested by his past behavioral difficulties. Judgment in the past appears to have been quite problematic. It is thought that Mr. Mull could respond appropriately to changes in an appropriate work place if he chose to do so.

(Tr. 201)

Mr. Fielder diagnosed Mr. Mull with polysubstance abuse in alleged remission, depressive disorder, NOD, associated with current economic, financial, and living arrangement limitations, history of antisocial personality disorder, and assessed a GAF of 45/50 (Tr. 201).

On May 23, 2002, Dr. Koons, a consultative examiner, conducted a physical residual functional capacity of Mr. Mull (Tr. 212-218). Dr. Koons found that Mr. Mull has no exertional limitations (Tr. 213), and no postural limitations, but that Mr. Mull should avoid ladder/rope/scaffolds due to his history of seizures (Tr. 214). Dr. Koons found that Mr. Mull has no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations, except that Mr. Mull should avoid concentrated exposure to hazards (machinery, heights, etc.), again because of his history of seizures (Tr. 215-16).

On June 4, 2002, Dr. Sandra Davis, Ph.D., a consultative examiner, conducted a mental residual functional capacity assessment of Mr. Mull which found him to be moderately limited in his ability to remember locations and work-like procedures, as well as his ability to make simple work-related decisions (Tr. 209) Dr. Davis further found that Mr. Mull is moderately limited in his ability to interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others (Tr. 209-210). Otherwise, Dr. Davis found that Mr. Mull was not significant limited in his work-related abilities (Tr. 209-210; 220-221). Dr. John Tedesco, Ph.D., affirmed Dr. Davis' findings (Tr. 219).

On October 25, 2002, Mr. Mull's treating psychiatrist, Dr. Collyer Ekholm, completed a psychiatric impairment questionnaire, provided by Mr. Mull's attorney (Tr. 223-27). Dr. Ekholm began treating Mr. Mull on April 16, 2002, and saw him

approximately once per month (Tr. 223). Dr. Ekholm diagnosed Mr. Mull as having schizoaffective disorder, and impulse control disorder not otherwise stated (Tr. 223). Dr. Ekholm identified Mr. Mull's symptoms to include sleep disturbance, mood disturbance, emotional liability, delusions or hallucinations, substance dependence, paranoia or inappropriate suspiciousness, suicidal ideation or attempts, oddities of thought, perception, speech or behavior, perceptual disturbances, social withdrawal or isolation, blunt, flat or inappropriate affect, illogical thinking or loosening of associations, decreased energy, and hostility and irritability (Tr. 223). Dr. Ekholm opined that Mr. Mull was not a malingerer, and that his combined impairments are reasonably expected to produce the subjective symptoms and functional limitations contained in her evaluation (Tr. 224). Dr. Ekholm stated that, as a result of Mr. Mull's psychiatric medications, his hallucination, paranoia, and depressive symptoms have decreased, and that the side effects of the medications are tolerable (Tr. 224).

As for Mr. Mull's prognosis, Dr. Ekholm stated "[t]his is still a schizophrenic illness - doubt we will have much improvement in ability to function" (Tr. 224). Dr. Ekholm assessed Mr. Mull with a GAF of 40 (Tr. 224). Dr. Ekholm had "no idea" whether Mr. Mull would work a normal eight hour work day, but then went on to explain that Mr. Mull is quite paranoid, has no job skills, avoids crowds, and has difficulty with authority figures such as bosses (Tr. 224-25).

Dr. Ekholm opined that Mr. Mull is extremely restricted in his activities of daily living and maintaining social functioning, and markedly restricted in maintaining concentration, persistence, or pace, and markedly limited due to repeated episodes of decompensation, each of extended duration (Tr. 225). According to Dr. Ekholm, Mr. Mull's impairments to affect his ability to understand, remember, and carry out instructions, although she was not able to provide specific detail, noting that Mr. Mull has not worked at all in many years and that the questions were too specific for her to answer (Tr. 226). Dr. Ekholm further opined that Mr. Mull's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting would be affected by his

impairment (Tr. 227). Specifically, Dr. Ekholm rated as "poor" Mr. Mull's ability to interact appropriately with the public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers and peers, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently of others (Tr. 227). Dr. Ekholm rated as "fair" Mr. Mull's ability to respond appropriately to changes in the work setting and to be aware of normal hazards and take appropriate precautions (Tr. 227).

## II. CONCLUSIONS OF LAW

### A. Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

## B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation.  See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)    If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)    If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe.  If the impairment is not severe, benefits are denied.

(3)    If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity.  If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.  If the claimant is able to perform her previous work, she is not disabled.

(5)    If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990).  (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work."  Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)).  If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to

perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience.  Id.

Under the first step of the analysis, the ALJ found that Mr. Mull had not engaged in substantial gainful activity  since his alleged onset date (Tr. 13, 19).  At the second step, the ALJ determined that Mr. Mull has a history of hepatitis C, polysubstance dependence, in alleged remission, depressive disorder, not otherwise specified, psychosis not otherwise specified, and history of antisocial personality disorder (Tr. 13-14, 19).  At the third step, the ALJ determined that Mr. Mull's impairments did not meet or equal one of the listed impairments (Tr. 14, 19).  At the fourth step, the ALJ determined that Mr. Mull has no past relevant work history Tr. 19).  Finally, the ALJ found that Mr. Mull has the residual functional capacity to perform the nonexertional requirements of work that is limited to simple repetitive tasks with limited contact with the public, and that Mr. Mull has no exertional limitations (Tr. 19).  Given this RFC, the ALJ determined that Mr. Mull could perform the jobs of housekeeper cleaner and laundry folder, and therefore is not disabled (Tr. 19-20).

### D.  Treating Physician

Mr. Mull argues that the ALJ erred in rejecting the opinions of his treating psychiatrist, Dr. Ekholm, regarding Mr. Mull's inability to sustain work (Tr. 15). Specifically, Mr. Mull contends that the ALJ erred in his finding that Mr. Mull had been on the same medication regimen since 2002.  Dr. Ekholm added an antidepressant to Mr. Mull's medications and increased the dosage of his Zyprexa, which helps manage symptoms of schizophrenia, several times.  Mr. Mull further argues that the ALJ failed to consider the nature and dosage of his medications, i.e., Dr. Ekholm was prescribing twice the maximum recommended dosage for Zyprexa by 2004, which is strong evidence supporting her opinions.  Moreover, Mr. Mull contends that while the ALJ noted several periods of apparent improvement in Mr. Mull's condition, he ignored the deterioration that often occurred the next month, thereby disregarding the cyclical nature of mental illness.

Finally, Mr. Mull argues that his consistently low Global Assessment of Function scores (GAF), while not determinative, is another factor weighing against the ALJ's decision.

The Commissioner counters that the ALJ properly gave little weight to Dr. Ekholm's opinion because it was inconsistent with her own treatment notes and was in a checklist format. In her October 2002 opinion, Dr. Ekholm diagnosed Mr. Mull with schizoaffective disorder and impulse control disorder not otherwise specified (Tr. 223). Dr. Ekholm's treatment records, however, set forth a diagnosis only of psychosis not otherwise specified until November 2003 (Tr. 267), when she changed it to schizoaffective disorder, and contain no mention whatsoever of impulse control disorder.

The Commissioner further argues that Dr. Ekholm's treatment records demonstrate improved symptoms when Mr. Mull was medically compliant, which contradicts the extreme findings reported by Dr. Ekholm in her October 2002 opinion. The Commissioner characterizes Dr. Ekholm's opinion as internally inconsistent, i.e., she stated that she had "no idea" whether Mr. Mull could work a normal eight-hour day, indicated that questions concerning Mr. Mull's ability to understand, remember and carry out instructions were too specific for her to answer, but then reported extreme and marked limitations in all of the criteria and provided detailed poor abilities in social functioning.

Finally, the Commissioner contends that the ALJ did consider the cyclical nature of mental illness, but properly found in this case that any increase in Mr. Mull's symptomology was related either to his being noncompliant with his medication regimen, or to his frustration at being denied social security benefits. Regarding Mr. Mull's GAF scores, the Commissioner argues that neither social security regulations nor case law require that an ALJ determine the extent of a claimant's impairment based upon a GAF score. Moreover, the Commissioner claims that the ALJ properly found that a GAF score of 45-50 was not consistent with the lack of more intense treatment or with the examination findings of Dr. Ekholm.

In reply, Mr. Mull argues that Dr. Ekholm's opinion should be given controlling weight because it is "not inconsistent" with the record, and that there is no requirement

that Dr. Ekholm's opinion be "consistent" with the record.  According to Mr. Mull, under the "consistent" standard, the treating physician's opinion has controlling weight only if the record supports it.  Mr. Mull further points to several instances of deterioration when he was being compliant with his medication regimen, and argues that his low GAF is consistent with Dr. Ekholm's disabling limitations.  Mr. Mull argues that Dr. Ekholm's honesty and forthrightness in declining to answer some questions posed by his attorney is not an inconsistency.  Mr. Mull contends that Dr. Ekholm's opinion, when properly credited, precludes competitive employment for him and that this matter should be remanded for the payment of benefits.  Alternatively, Mr. Mull argues that this matter should be remanded for further consideration of Dr. Ekholm's opinions, a new assessment of Mr. Mull's mental residual functional capacity, and vocational evidence regarding the ability of work in light of his mental RFC.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.  A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted).  The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician.  See 20 C.F.R. § 404.1527(d)(2).  Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight.  Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).  Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement.  Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996).  See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that

the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

Although Dr. Ekholm treated Mr. Mull for a considerable amount of time, and appears to have done much to improve his mental functioning, the court cannot say that the ALJ erred in refusing to give her October 2002 opinion controlling weight. As of October 2002, Dr. Ekholm had only been seeing Mr. Mull, on a monthly basis, for six months. There is no indication in the record that Dr. Ekholm subjected Mr. Mull to any psychological testing, but rather appears to have based her diagnoses on his self-serving reports. Dr. Ekholm's opinion is also inconsistent with the records of Mr. Mull's psychiatric evaluations conducted while he was in prison, where he went two years without psychiatric medication, but was very focused on receiving a psychiatric diagnosis and medication so he could resume his disability payments upon release. Mr. Mull's quest to obtain social security, and frustration with being denied, also seems to have been the motivating factor in the quality of his moods and intensity of his symptoms while treating with Dr. Ekholm. Mr. Mull's social worker actually encouraged him to look for work, but Mr. Mull did not want to hurt his chances at receiving disability benefits. The record as a whole also supports the ALJ's conclusion that an increase in Mr. Mull's symptomology on occasion occurred after Mr. Mull had been medically noncompliant. The court will not disturb the ALJ's finding in this regard.

## E. Residual Functional Capacity

The ALJ in this case found that Mr. Mull has the residual functional capacity to perform the "nonexertional requirements of work that is limited to simple repetitive tasks with limited contact with the public" (Tr. 19). Mr. Mull argues that this assessment of his mental residual functional capacity is overly simplistic and contrary to the assessments of Drs. Ekholm, Davis, and Tedesco. According to Mr. Mull, Dr. Ekholm found that he had virtually no useful ability to interact with the public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and

21

set realistic goals. Dr. Davis, a state consultative psychologist, found that Mr. Mull was moderately limited in his ability to: remember locations and work-like procedures; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general pubic; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of others. Dr. Tedesco, another non-examining psychologist, affirmed Dr. Davis' findings.

The Commissioner counters that, after properly engaging in the credibility analysis, the ALJ incorporated into Mr. Mull's RFC the impairments and restrictions found credible. The Commissioner argues that the ALJ's RFC determination is consistent with the conclusions of Mr. Fielder, who indicated that Mr. Mull could carry out at least moderately complex instructions, maintain a reasonable degree of attention, concentration and pace, respond appropriately to changes in the work place, but might have some difficulty interacting appropriately with others.

In reply, Mr. Mull argues that the ALJ must explain the weight given to state agency opinions in his decision and that his failure to do so in this case is sufficient reason to warrant remand. With respect to Mr. Fielder's opinion, Mr. Mull notes that Mr. Fielder is not a Ph.D. or an M.D. He saw Mr. Mull one time in early 2002 (30 months before the hearing in October 2004) and did not review one record from the time period Mr. Mull contends he was disabled. Mr. Mull argues that Mr. Fielder's opinion does not constitute substantial evidence to support the ALJ's RFC. Mr. Mull requests that this matter be remanded for a function-by-function assessment of Mr. Mull's mental residual functional capacity and for supplemental vocational expert testimony regarding the number of jobs actually available to Mr. Mull.

Determining a claimant's residual functional capacity is a medical question. Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McGivney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). However, the record "must include some medical evidence that supports the ALJ's residual functional capacity finding." Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (citing Anderson, 51 F.3d at 779); Later, 245 F.3d at 704 (noting that while the ALJ was not "limited to considering medical evidence," the ALJ was "required to consider at least some supporting evidence from a professional."). "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Further, an ALJ "may not draw upon his own inferences from medical reports." Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975). "If the ALJ did not believe, moreover, that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [the claimant's] mental impairments limited his ability to engage in work-related activities." Later, 245 F.3d at 706 (citing Nevland, 204 F.3d at 858; 20 C.F.R. § 404.1519a(b)).

The ALJ mentioned the consultative examiners' opinions, but only insofar as Drs. Davis and Tedesco opined that Mr. Mull was restricted from climbing ladders, ropes or scaffolds, an opinion discounted by the ALJ because he found that no medical evidence documenting Mr. Mull's seizures other than Mr. Mull's personal accounts. The ALJ offered no reason for discounting the mental restrictions imposed by Drs. Davis and Tedesco, which is err. Reeder v. Apfel, 214 F.3d 984, 987 (8th Cir. 2000) ("We conclude that the ALJ erred by making his own estimate of Ms. Reeder's IQ level, absent any support in the medical evidence and without specifically discrediting the estimate of

the sole mental health examiner in this case."). Mr. Fielder's opinion is precisely the type of opinion routinely found by the courts to not constitute substantial evidence supporting the RFC. Moreover, the record as a whole appear to be consistent with the limitations set forth by Drs. Davis and Tedesco. To fail to include any such limitations and offering no reason for doing so warrants remand. On remand, the ALJ shall elicit vocational expert testimony concerning Mr. Mull's ability to sustain competitive employment incorporating the limitations as found by Drs. Davis and Tedesco (Tr. 207-211). The ALJ shall also include the postural limitation of avoiding ladders, ropes, scaffolds, hazards and machinery, due to Mr. Mull's seizure disorder, which is documented in the record and recommended by the state consultative examiner Dr. Wilson in his physical residual functional capacity assessment (Tr. 212-218).

### F. Fully & Fairly Develop the Record

The ALJ is duty bound to "develop the record fairly and fully," <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004). "[E]vidence developed in an administrative hearing must be fully and impartially evaluated and resolved to meet the ends of justice, not molded to fit the predisposition of the factfinder." <u>Cline v. Sullivan</u>, 939 F.2d 560, 569 (8th Cir. 1991).

Mr. Mull argues that the ALJ erred in failing to fully and fairly develop the record with respect to his work-related physical limitations arising from his hepatitis C. Mr. Mull had no health insurance and could not afford medical treatment for his condition, but testing revealed that his liver enzymes were elevated while he was in prison, and Mr. Mull testified that he believes that his hepatitis contributes to his fatigue and lack of stamina. Mr. Mull requests that this matter be remanded to obtain a consultative examination to determine the extent to which Mr. Mull's hepatitis C affects his ability to work.

The Commissioner counters that the ALJ is required to order a consultative medical examination only when the evidence as a whole is insufficient to support a decision on a claim. The Commissioner further argues that it is Mr. Mull's responsibility to provide medical evidence to show that he is disabled, and in this case there was no indication of

treatment for hepatitis C, nor any recommendations during his psychiatric treatment that Mr. Mull seek medical treatment for his hepatitis. Regarding Mr. Mull's alleged fatigue caused by his hepatitis, the Commissioner notes that Dr. Ekholm's records state that Mr. Mull slept because he had "nothing to do during the day" (Tr. 269). Moreover, the Commissioner notes that while economic considerations for the lack of treatment can be relevant to a disability determination, Mr. Mull offered no evidence that he had been denied treatment or that he sought medical treatment offered to indigents, as he had with psychiatric treatment.

It is Mr. Mull's burden to prove that he is disabled. The record is replete with references to Mr. Mull's excessive sleeping, which he calls his "hobby," and his linking it either to his depression or lack of anything else to do. There are no medical treatment records upon which a consultative examination could be performed. Mr. Mull clearly understood how to seek psychiatric care for indigents. That he failed to do so for his hepatitis C discredits his argument that it prevents him from working. The ALJ did not err in failing to obtain a consultative medical examination in this case.

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is reversed and this matter is remanded for further proceedings in accordance with this opinion.

June 8, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT